U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FILED    **Apr 21 2020**

CAROL L. MICHEL
CLERK

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

FEDERAL DEPOSIT INSURANCE
CORPORATION, AS RECEIVER FOR
FIRST NBC BANK,

Plaintiff,

vs.

ASHTON J. RYAN, JR., WILLIAM D.
AARON, JR., WILLIAM CARROUCHE,
HERMANN MOYSE, III, GRISH ROY
PANDIT, STEPHEN PETAGNA, R.
MICHAEL WILKINSON, ZURICH
AMERICAN INSURANCE COMPANY,
ILLINOIS NATIONAL INSURANCE
COMPANY, CONTINENTAL CASUALTY
COMPANY, GREAT AMERICAN E&S
INSURANCE COMPANY, FEDERAL
INSURANCE COMPANY, U.S.
SPECIALTY INSURANCE COMPANY, XL
SPECIALTY INSURANCE COMPANY,
FREEDOM SPECIALTY INSURANCE
COMPANY, MARKEL AMERICAN
INSURANCE COMPANY, and
BERKSHIRE HATHAWAY SPECIALTY
INSURANCE COMPANY,

Defendants.

Civil Action No. _____20-cv-1253 S(4)_____

Jury Trial Demanded

## COMPLAINT FOR RECOVERY OF DAMAGES – FILED UNDER SEAL

Plaintiff Federal Deposit Insurance Corporation, as Receiver for First NBC Bank ("FDIC-R"), hereby states its complaint against the Defendants as follows:

### NATURE OF THE CASE

1.     On April 28, 2017, the Louisiana Department of Financial Institutions ("LOFI") closed First NBC Bank ("First NBC" or the "Bank") and appointed the FDIC-R Receiver.

___Fee_____
___Process_____
___Dktd_____
___CtRmDep _____
___Doc. No _____

2.      The FDIC-R brings this action in its capacity as Receiver seeking to recover over $164 million in losses the Bank suffered on dozens of loans which the individual Defendants, through at least gross negligence, caused the Bank to make to financially distressed borrowers.

3.      The FDIC-R is entitled to recover from Defendant Ashton J. Ryan Jr. ("Ryan"), the Bank's former Board Chairman, President, and Chief Executive Officer ("CEO"), damages of at least $113 million for his gross negligence and breaches of fiduciary duty in abusing his Incremental Lending Authority ("ILA"). Ryan recklessly deployed his ILA to approve scores of improper credit extensions to at least eight different borrower relationships (the "ILA Loans").

4.      The FDIC-R also is entitled to recover damages of at least $51 million from Ryan and six non-officer directors who, like Ryan, were members of the Bank's Board Loan Committee ("BLC")—Defendants William D. Aaron, Jr. ("Aaron"), William Carrouche ("Carrouche"), Hermann Moyse, III ("Moyse"), Grish Roy Pandit ("Pandit"), Stephen Petagna ("Petagna"), and R. Michael Wilkinson ("Wilkinson") (the "Non-Officer BLC Defendants," and, together with Ryan, the "BLC Defendants")—for their gross negligence in approving other credit extensions to at least five borrower relationships (the "Director Loans"). Collectively, the ILA Loans and Director Loans are referred to as the "Loss Loans."

5.      As detailed below, among other breaches of duty, the BLC Defendants recklessly disregarded, and acted with carelessness amounting to indifference to, the best interests of the Bank by subjecting the Bank to extremely unsafe and unsound lending practices and corresponding financial risks. Specifically, the BLC Defendants repeatedly violated the Bank's loan policy and federal banking regulations; failed to adequately inform themselves of relevant risks; and otherwise flagrantly departed from prudent lending standards when they approved obviously risky and deficiently underwritten loans.

**FILED UNDER SEAL**                          2

6.      The magnitude of the BLC Defendants' misconduct and corresponding liability to the FDIC-R is underscored by the numerous and diverse ways in which they committed gross negligence and in which Ryan breached his fiduciary duties to the Bank. As detailed below, the eight borrower relationships to which the Bank extended the loans this complaint addresses— denoted here as RM, GG, KC, TH, AP, PCC, MP, and GSA for privacy reasons until a protective order is in place—involved a diverse group of separate borrowers in different loan lines (for example, oil and gas; commercial and industrial; acquisition, development, and construction; and commercial real estate). Among other differences, the loan purposes, collateral, and specifics of loan policy violations and other gross departures from prudent lending standards varied from borrower to borrower. Yet as to each borrower, Ryan (with respect to the ILA Loans) and the BLC Defendants (with respect to the Director Loans) engaged in conduct that substantially deviated below the standard of care expected to be maintained by a reasonably careful person under like circumstances.

7.      In addition to recovery from the BLC Defendants, the FDIC-R is entitled to recover the losses described in this complaint directly from ten insurance companies (the "Insurer Defendants"). The Insurer Defendants provided director-and-officer ("D&O") liability insurance to the BLC Defendants during the relevant time period. Accordingly, the Insurer Defendants' liability is derivative of the BLC Defendants' liability. Though the damages the BLC Defendants inflicted on the Bank exceed the aggregate limits of the Insurer Defendants' insurance policies, those policies cover the losses arising from each of the FDIC-R's claims.

**FILED UNDER SEAL**          3

## THE PARTIES

### A.  The FDIC-R

8.  The FDIC is a corporation and instrumentality of the United States of America established under the Federal Deposit Insurance Act, 12 U.S.C. § 1811 *et seq.*, which is charged with, among other things, the orderly liquidation of failed banks. 12 U.S.C. § 1821(d).

9.  Pursuant to 12 U.S.C. §§ 1821(d)(2)(A) and 1823(d)(3)(A), upon its appointment as Receiver the FDIC-R succeeded to all rights, titles, powers, privileges, and assets of First NBC, including its rights and claims against the Bank's former directors and officers and their liability insurers.

### B.  The BLC Defendants

10.  Ryan was First NBC's Chairman, President, and CEO, and a member of both the BLC and the Senior Loan Committee ("SLC") from 2006 until he was removed as CEO on December 1, 2016. Thereafter, he continued as Chairman, President, and BLC and SLC member until he resigned on April 6, 2017. As discussed below, Ryan committed wrongful acts both in his capacity as a Bank director and as a Bank officer.

11.  Aaron was a Bank director and BLC member from 2006 and the Bank's General Counsel from December 2016 until the Bank failed.

12.  Carrouche was a Bank director and BLC member from 2006 until the Bank failed.

13.  Moyse was a Bank director and BLC member from 2006 and interim CEO from December 2016 until the Bank failed.

14.  Pandit was a Bank director and BLC member from 2006 until the Bank failed.

15.  Petagna was a Bank director and BLC member from 2006 until the Bank failed.

16.  Wilkinson was a Bank director and BLC member from 2006 until the Bank failed.

**FILED UNDER SEAL**       4

C.       **The Insurer Defendants**

17.       Defendant Zurich American Insurance Company ("Zurich") is a corporation that was, during the relevant period, an admitted insurer authorized to do and doing business in Louisiana. It issued a $15 million primary D&O liability insurance policy (plus $1 million in excess coverage available in certain circumstances) that covers losses arising from claims alleged in this complaint.

18.       Defendant Illinois National Insurance Company ("INIC") is a corporation that was, during the relevant period, an admitted insurer authorized to do and doing business in Louisiana. It issued three excess D&O liability insurance policies, in the amounts of $15 million, $10 million, and $5 million, that cover losses arising from claims alleged in this complaint.

19.       Defendant Continental Casualty Company ("Continental") is a corporation that was, during the relevant period, an admitted insurer authorized to do and doing business in Louisiana. It issued a $10 million excess D&O liability insurance policy that covers losses arising from claims alleged in this complaint.

20.       Defendant Great American E&S Insurance Company ("Great American") is a corporation that was, during the relevant period, an approved surplus lines insurer doing business in Louisiana. It issued a $10 million excess D&O liability insurance policy that covers losses arising from claims alleged in this complaint.

21.       Federal Insurance Company ("Federal") is a corporation that was, during the relevant period, an admitted insurer authorized to do and doing business in Louisiana. It issued a $10 million excess D&O liability insurance policy that covers losses arising from claims alleged in this complaint.

**FILED UNDER SEAL**        5

22.     U.S. Specialty Insurance Company ("U.S. Specialty") is a corporation that was, during the relevant period, an admitted insurer authorized to do and doing business in Louisiana. It issued a $10 million primary D&O liability insurance policy and a $5 million excess D&O liability insurance policy that cover losses arising from claims alleged in this complaint.

23.     XL Specialty Insurance Company ("XL") is a corporation that was, during the relevant period, an admitted insurer authorized to do and doing business in Louisiana. It issued a $10 million excess D&O liability insurance policy that covers losses arising from claims alleged in this complaint.

24.     Freedom Specialty Insurance Company ("Freedom") is a corporation that was, during the relevant period, an admitted insurer authorized to do and doing business in Louisiana. It issued a $10 million excess D&O liability insurance policy that covers losses arising from claims alleged in this complaint.

25.     Markel American Insurance Company ("Markel") is a corporation that was, during the relevant period, an admitted insurer authorized to do and doing business in Louisiana. It issued a $5 million excess D&O liability insurance policy that covers losses arising from claims alleged in this complaint.

26.     Berkshire Hathaway Specialty Insurance Company ("Berkshire") is a corporation that was, during the relevant period, an admitted insurer authorized to do and doing business in Louisiana. It issued a $5 million excess D&O liability insurance policy that covers losses arising from claims alleged in this complaint.

**JURISDICTION AND VENUE**

27.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1345, made applicable through 12 U.S.C. §§ 1819(b)(1), 1819(b)(2)(A), and 1821(d).

**FILED UNDER SEAL**          6

28.     The Court has personal jurisdiction over the Defendants because at all relevant times each BLC Defendant was a resident of Louisiana and/or conducted the business of the Bank in Louisiana and each Insurer Defendant was an admitted insurer authorized to do and doing business in Louisiana or an approved surplus lines insurer doing business in Louisiana that issued one or more policies of liability insurance in Louisiana insuring the Bank and its officers and directors.

29.     Venue is proper pursuant to 28 U.S.C. § 1391(b) as a substantial part of the events and omissions giving rise to the FDIC-R's claims occurred in this judicial district and at least one Defendant resides in this district.

### FACTUAL BACKGROUND

30.     First NBC was a state-chartered bank (not a member of the Federal Reserve System) headquartered in New Orleans, Louisiana, which opened on May 19, 2006.

31.     During all relevant times, the Bank was wholly owned by First NBC Bank Holding Company ("FNBC"), a publicly traded single-bank holding company also based in New Orleans.

32.     Between 2007 and 2016, First NBC grew rapidly and eventually operated thirty-five branches in South Louisiana and five branches in the Florida Panhandle. Bank assets grew from $374 million to $4.19 billion.

33.     The BLC Defendants' reckless lending ultimately led to a significant increase in First NBC's classified assets (loans for which payment is not made in a timely manner). The Bank's classified assets continued to climb to $707 million through April 13, 2017, which significantly eroded the Bank's capital to the point that it became insolvent and was closed by LOFI.

**FILED UNDER SEAL**          7

A.      **The Bank's Lending Operation and Loan Policy**

34.     Loan underwriting practices are the primary determinant of bank credit risk and bank credit availability and one of the most critical aspects of loan portfolio management. Loan underwriting standards define the bank's desired level of creditworthiness for individual loans and provide uniform criteria for evaluating loans with similar characteristics. Underwriting standards also are important in protecting the bank's capital, which can erode from unsafe and unsound lending practices.

35.     Underwriting practices (which are described in Parts 364 and 365 of the FDIC Rules and Regulations) generally can be characterized by the criteria used to qualify borrowers, loan pricing, repayment terms, sources of repayment, and collateral requirements. Underwriting practices also encompass the management and administration of the portfolio, including its growth, concentrations in specific markets, out-of-area lending, written lending policies, and adherence to written underwriting policies.

36.     The foremost means to control loan quality and ensure a good loan portfolio is the loan approval process. An effective loan approval process establishes minimum requirements for the information and analysis upon which a credit decision is based. The purpose of a loan approval process is to provide controls to ensure acceptable credit at origination.

37.     The First NBC Board of Directors ("Board"), including the BLC Defendants, recognized that adherence to the Bank's Board-approved set of loan policies (the "Loan Policy") was needed to "ensure uniform, appropriate, credit quality for the institution" because "sound loans [were] paramount to the financial success of the bank."

38.     Among other requirements, during the relevant time period, the Loan Policy required a complete loan package before approval, which was to include the Bank's standard credit

**FILED UNDER SEAL**          8

memorandum, pricing model, current financial statements, and other documentation to establish the financial condition of borrowers and guarantors, including detailed income, cashflow/debt service ability, verified liquidity, leverage, collateral, and contingent liabilities information. The Loan Policy also specified maximum loan-to-value ("LTV") ratios and terms for real estate lending and required market value real estate appraisals by qualified independent appraisers, unless exempted. Loans were not to be made based solely on the value of pledged collateral.

39.     The Loan Policy discouraged making certain loans (deemed undesirable) if (1) financial information did not support the credit; (2) the payment schedule was ill-defined; (3) the loan was for various sorts of speculative projects, including speculative construction and development projects; and/or (4) the project was outside the Bank's recognized trade area.

40.     The Loan Policy also limited the authority of bank officials to approve loans based on the Bank's aggregate exposure to the borrower seeking the loan.

(a) **Ryan.** According to the Loan Policy, Ryan generally could approve loans by himself only when, accounting for the loan under consideration, the Bank's aggregate exposure to the borrower relationship would be no more than $7.5 million. In addition, Ryan could use his ILA to extend up to $1 million in credit "for existing customers that are performing as agreed," if the borrower was risk rated 5 ("marginally acceptable/watch") or better and "appropriate financial statements" existed in the file. Ryan could use his ILA only for "emergency credit" and only once per customer relationship until SLC or BLC review. The Bank's standard credit memorandum and pricing model were required to document and support any such additional credit extension.

(b) **The SLC.** The SLC could approve loans when, accounting for the loan under consideration, the Bank's aggregate exposure to the borrower relationship would be no more than

**FILED UNDER SEAL**          9

$15 million. It also had review authority over new or renewed loans exceeding $1 million (including Ryan's ILA approvals).

(c) ***The BLC***. The BLC could approve loans when, accounting for the loan under consideration, the Bank's aggregate exposure to the borrower relationship would be no more than $25 million. It also had review authority for loans exceeding $1 million, renewed loans exceeding $2.5 million, additional credit to substandard borrowers, and loans reviewed or approved by the SLC (including Ryan's ILA approvals).

(d) ***The Board.*** The Board had to approve extensions of credit when the Bank's aggregate exposure to the borrower would exceed $25 million. It also had authority to review extensions of additional credit to substandard borrowers.[1]

41.    Boards of directors create board committees to ensure that at least some subset of their members has, or, if necessary, develops, the skills, knowledge, and expertise required for the board to act on behalf of the entity in different subject areas (for example, audit and accounting, finance, executive compensation, and the like). At First NBC, the subset of the Board with special responsibilities for, and that developed special expertise with respect to, the Bank's lending practices was the Board Loan Committee.

42.    For example, Bank policies required the BLC, not officers alone, to approve and/or review certain loans, especially those involving large borrowing relationships and, at times, loans to customers with substandard or worse risk ratings; to review and discuss the quality of the Bank's loan portfolio, including, but not limited to, receiving and analyzing reports about non-performing

---

[1] On December 17, 2014, the Board approved a revised Loan Policy requiring BLC approval of additional credit to substandard borrowers to comply with a 2013 Board Resolution. Subsequently, in the Loan Policy approved October 21, 2015, the Board removed the requirement that the BLC approve additional credit to substandard borrowers, requiring instead review by the BLC and Board.

**FILED UNDER SEAL**                     10

loans, Criticized Asset Action Plans ("CAAPs"), overdrafts, interest reserves, charge-offs and recoveries, troubled debt restructurings, Allowances for Loan and Lease Losses ("ALLL"), watch list loans, portfolio analyses by risk rating and weighted average risk rating, loans with interest reserves, stock secured loans, and the loan pipeline; and to monitor the independence and completeness of the Bank's loan review program.

43.     By the time the BLC Defendants approved the Director Loans, each BLC Defendant had been a member of the committee for approximately eight years. Accordingly, the BLC Defendants had a special combination of experience, knowledge, and access to information relative to the rest of the Board that enabled them to assess the loans that fell within their purview.

**B.     The Bank's History of Risky Lending Practices**

44.     Even before they approved the Loss Loans the Non-Officer BLC Defendants knew that Ryan had a history of engaging in overly liberal lending practices to financially distressed borrowers. Disregarding this history, however, the BLC Defendants continued to extend credit, including the Loss Loans, to financially distressed borrowers.

45.     At least during the three-year period preceding the Loss Loans, for example, Ryan, who dominated the Bank's lending practices, overused loan extensions and overdrafts to borrowers to fund cash shortfalls and/or operational expenses. Such practices are of concern because, among other issues, they involve extending more credit to borrowers that already have experienced financial problems, including problems paying their loan obligations on time. The BLC Defendants were aware of these problems. Ryan acknowledged that loan extensions had been used too frequently and that extension and overdraft practices needed to change.

46.     But Ryan did not make the necessary changes. Instead, he continued to dominate the Bank's lending practices. Loans continued to be made to financially distressed borrowers. In

**FILED UNDER SEAL**          11

particular, Ryan continued to use his ILA to extend credit to cashflow-impaired borrowers and to allow large overdrafts which did not clear until the end of the month. These practices elevated the Bank's risk and contributed significantly to a deterioration in the Bank's asset quality.

47.     The BLC Defendants were aware of these continuing problems. For example, the Non-Officer BLC Defendants knew that the kind of loan administration practices that Ryan was employing, including approving loans for the vague purpose of providing borrowers with general "working capital," could mask the level of a borrower's problem assets and result in costly and unnecessary loan losses. As a result, the Non-Officer BLC Defendants knew that improvements were needed in credit administration practices to reduce the volume of adversely classified assets and to ensure that Ryan was not over-lending. In short, the Non-Officer BLC Defendants knew that they could not in good faith over-rely on Ryan but rather had to inform themselves adequately and exercise independent judgment to fulfill their responsibilities as fiduciaries of the Bank.

48.     Unfortunately, as the Loss Loans reflect, Ryan and the Non-Officer BLC Directors did not take remotely adequate corrective action. Ryan continued to dominate loan extensions. The Non-Officer BLC Defendants abdicated their responsibilities to exercise due care when approving loans that the Board had placed within their, and not merely Ryan's, purview, by failing to perform anything close to the kind of due diligence that any reasonably careful person would perform in the circumstances and effectively deferring to Ryan even as to large credit exposures that lay beyond management's authority to approve. This lack of due care rose to the level of a reckless disregard of, or a carelessness amounting to indifference to, the best interests of the Bank and involved a substantial deviation below the standard of care expected to be maintained by a reasonably careful person under like circumstances. The BLC Defendants' lack of due care also contributed to the Bank's overall deterioration in asset quality.

**FILED UNDER SEAL**                    12

**C.**     **The BLC Defendants' Gross Negligence and Ryan's Breaches of Fiduciary Duty in Connection with the Loss Loans**

49.     In approving the Loss Loans, Ryan committed gross negligence and breached his fiduciary duties to the Bank. The Non-Officer BLC Defendants likewise committed gross negligence in approving the Director Loans. While the specific deficiencies and violations differed from borrower to borrower, the BLC Defendants' gross negligence included violating multiple provisions of the Loan Policy; violating reasonable and prudent banking practices, including, but not limited to, the general safety and soundness and underwriting standards of 12 C.F.R. § 364.101, Appendix A; and violating the real estate lending standards of 12 C.F.R. § 365.2, Appendix A.

50.     The Loss Loans are identified in the tables below using initials of the borrowers. As noted, full names will be disclosed once an appropriate protective order is in place. These Loss Loans are illustrative, not exhaustive, of loans that the BLC Defendants approved in violation of their duties to the Bank. The FDIC-R reserves its right to identify additional Loss Loans.

51.     The following table lists ILA Loans that Ryan approved through gross negligence and in violation of his fiduciary duties, and their corresponding loss amounts.

| ILA Loans | | | | | | |
|---|---|---|---|---|---|---|
| Borrower | Loan No. | Credit Amount ($ millions) | Number of ILA Loans | Approval Date(s) | | Loss ($ millions) |
| | | | | From | To | |
| 1.  RM | 136119 | $51.65 | 52 | July 2, 2015 | Aug. 31, 2016 | $50.52 |
| 2.  GG/CPI[2] | 129882 | $10.00 | 10 | Sept. 29, 2014 | Feb. 10, 2015 | $5.13 |
| 3.  GG/CPI | 146855 | $17.00 | 17 | Feb. 23, 2015 | Nov. 10, 2015 | $13.59 |
| 4.  GG/CPI | 152091 | $13.00 | 13 | Nov. 27, 2015 | Feb. 3, 2016 | $10.43 |
| 5.  GG/CPI | 157734 | $1.00 | 1 | May 18, 2016 | | $0.81 |
| 6.  GG/CPI | 157778 | $1.00 | 1 | May 25, 2016 | | $0.81 |
| 7.  GG/CPI | 157965 | $1.00 | 1 | June 8, 2016 | | $0.81 |

---

[2]     CPI was the borrowing entity used by GG.

**FILED UNDER SEAL**          13

| ILA Loans | | | | | | |
|---|---|---|---|---|---|---|
| Borrower | Loan No. | Credit Amount ($ millions) | Number of ILA Loans | Approval Date(s) | | Loss ($ millions) |
| | | | | From | To | |
| 8.  GG/CPI | 157998 | $1.00 | 1 | June 16, 2016 | | $0.81 |
| 9.  GG/CPI | 158075 | $1.00 | 1 | June 23, 2016 | | $0.81 |
| 10. GG/CPI | 160781 | $1.00 | 1 | July 26, 2016 | | $0.81 |
| 11. GG/CPI | 160792 | $1.00 | 1 | July 28, 2016 | | $0.81 |
| 12. GG/CPI | 160836 | $1.00 | 1 | Aug. 5, 2016 | | $0.81 |
| 13. GG/CPI | 160880 | $1.00 | 1 | Aug. 18, 2016 | | $0.81 |
| 14. GG/CPI | 161023 | $0.50 | 1 | Oct. 5, 2016 | | $0.41 |
| 15. GG/CPI | 161122 | $0.50 | 1 | Nov. 30, 2016 | | $0.41 |
| 16. KC | 003488 | $2.00 | 4 | Oct. 29, 2015 | Aug. 31, 2016 | $1.95 |
| 17. TH | 162937[3] | $6.00 | 6 | Apr. 13, 2015 | Mar. 2, 2016 | $3.18 |
| 18. TH | 127220 | $1.00 | 1 | July 27, 2016 | | $0.53 |
| 19. AP | 145469 | $1.50 | 4 | Nov. 18, 2015 | Mar. 24, 2016 | $1.48 |
| 20. PCC | 019321 | $11.00 | 12 | Aug. 29, 2014 | Aug. 29, 2016 | $11.00 |
| 21. MP | 122776 | $3.90[4] | 4 | Aug. 22, 2014 | June 17, 2016 | $1.63 |
| 22. GSA/CD[5] | 086630 | $2.00 | 2 | Mar. 31, 2015 | Apr. 29, 2015 | $1.96 |
| 23. GSA/SAI | 136856 | $1.00 | 1 | Sept. 30, 2015 | | $0.58 |
| 24. GSA/SAI | 143995 | $4.00 | 4 | Dec. 7, 2015 | May 31, 2016 | $2.06 |
| 25. GSA/GD | 148978 | $2.22 | 3 | Jan. 29, 2016 | Sept. 30, 2016 | $1.14 |
| Total | | | 144 | | | $113.29 |

52.     The following table lists Director Loans that the BLC Defendants approved through gross negligence and their corresponding loss amounts. Notably, the BLC's Chairman opposed loans involving each of these borrowers. Nevertheless, the BLC Defendants ignored the Chairman's warnings and recklessly approved the Director Loans.

---

[3]     This loan consolidated several underlying loans of various types.

[4]     In addition to this $3.9 million credit, the final loan in this series consolidated an additional $600,000 from other loans, bringing the total principal of the loan to $4.50 million.

[5]     Borrowers CD, SAI, and GD are part of the GSA borrower relationship.

**FILED UNDER SEAL**          14

| Director Loans | | | | | Approval Votes** | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Borrower | Loan No. | Credit Amount ($ millions) | Approval Date | Loss ($ millions) | Ryan | Aaron | Carrouche | Moyse | Pandit | Petagna | Wilkinson |
| 1.  RM | 125911 | $4.00 | Aug. 27, 2014 | $3.90 | x | x | x | x | x | x | x |
| 2.  RM | 129970 | $4.00 | Feb. 25, 2015 | | x | x | x | x | x | x | x |
| 3.  RM | 129970 | $2.50[6] | Apr. 22, 2015 | $6.35 | x | x | x | x | x | x | x |
| 4.  RM | 152498 | $3.90 | Mar. 23, 2016 | $3.81 | x | x | x | x | x | x | x |
| 5.  GG/CPI | 157624 | $6.78 | Sept. 3, 2015 | | x | x | x | a | x | x | x |
| 6.  GG/CPI | 157624 | $14.22[7] | Mar. 23, 2016 | $17.04 | x | x | x | x | x | x | x |
| 7.  GG/CPI | 161001 | $2.81 | Sept. 28, 2016 | $2.29 | x | x | x | x | x | x | o |
| 8.  TH | 127220 | $10.15 | Sept. 24, 2014 | | x | x | x | x | x | x | x |
| 9.  TH | 127220 | $2.40 | Sept. 3, 2015 | $6.67 | x | x | x | a | x | x | x |
| 10. TH | 162937 | $1.42 | June 24, 2015 | | x | x | x | x | x | x | x |
| 11. TH | 162937 | $1.50 | Nov. 18, 2015 | $4.68 | x | x | x | x | x | x | x |
| 12. TH | 162937 | $5.92 | Nov.18, 2015 | | x | x | x | x | x | x | x |
| 13. TH | 165126 | $1.40 | Oct. 31, 2016[8] | $0.74 | x | x | a | x | x | x | a |
| 14. MP/HH[9] | 163564 | $10.62 | Jan. 25, 2017 | $4.45 | x | x | x | x | x | x | x |
| 15. GSA/SAI | 136856 | $2.18 | July 29, 2015 | $1.27 | x | x | x | x | x | x | x |

[6]    In addition to this $2.50 million credit increase, the BLC Defendants approved renewing the $4.00 million credit that they previously had approved on this loan.

[7]    In addition to this $14.22 million credit increase, the BLC Defendants approved renewing the $6.78 million credit that they previously had approved on this loan.

[8]    This loan initially was approved on October 26, 2016 with additional requirements and with Carrouche and Wilkinson voting in favor, then re-approved on October 31, 2016 without those requirements and with Carrouche and Wilkinson absent.

[9]    HH was the borrowing entity used by MP.

**FILED UNDER SEAL**          15

| Director Loans | | | | | Approval Votes** | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Borrower | Loan No. | Credit Amount ($ millions) | Approval Date | Loss ($ millions) | Ryan | Aaron | Carrouche | Moyse | Pandit | Petagna | Wilkinson |
| 16. GSA/GD | 148978 | $1.29[10] | Feb. 2, 2017 | $0.66 | x | x | x | x | x | x | x |
| **Total** | | | | **$51.86** | | | | | | | |

Key to "Approval Votes" columns of the table: "x" = approval; "o"= opposed; "a" = absent

53.     The following Loss Loans, which are discussed by borrowing relationship (and which discussions hereby incorporate the approval information set forth in paragraph 52 above), illustrate the BLC Defendants' grossly negligent failures, breaches, and violations of duty, which caused damages to the Bank and, ultimately, the FDIC-R.

### 1.     Borrower RM

54.     As set forth in paragraphs 51 and 52, the Loss Loans to Borrower RM totaled at least $66 million, and the Bank lost at least $64 million on those loans. These Loss Loans consist of four Director Loans that the BLC Defendants approved under three loans numbers (Loans 125911, 129970, and 152498) and 52 ILA credit extensions that Ryan approved (or were approved on his behalf) under a single loan number (Loan 136119). The primary stated purpose of these loans was to finance the development of non-producing and undeveloped oil and gas reserves in South Louisiana.

55.     As detailed below, Ryan committed gross negligence and breached his fiduciary duties in approving the RM ILA Loans by, among other things, making 52 $1-million loans to RM

---

[10]   In addition to this $1.29 million credit increase, the BLC Defendants approved renewing the $2.22 million credit that Ryan previously had approved on this loan using his ILA.

**FILED UNDER SEAL**          16

on a nearly weekly basis for the purported purpose of drilling a single non-producing offshore oil well in the midst of a market free fall and industry distress, even though the borrower plainly had insufficient cash flow to amortize the loan and instead required the loans to cover its interest payments and avoid non-accrual. The BLC Defendants committed gross negligence in approving the RM Director Loans by, among other things, extending credit to an uncreditworthy borrower for inherently speculative and risky oil and gas exploration and production activities, initially without any policy to guide their lending decisions and, later, in violation of the policy the Board belatedly adopted, and despite the fact that, contrary to other parts of the Loan Policy, the limited and insufficient financial information they had regarding the borrower revealed that its collateral did not produce enough cash flow to cover the amortization of the loans and the collateral was insufficient to secure the loans.

56.     Lending for oil and gas exploration is a very specialized type of lending, which is recognized as a high-risk endeavor and therefore requires conservative underwriting, appropriate structuring, experienced and knowledgeable lending staff, and sound loan administration practices. The FDIC has long recognized the inherent risk in this type of lending, and federal guidelines about oil and gas lending have been in place for decades. Nevertheless, the BLC Defendants disregarded these guidelines, particularly the ones for reserve-based loans. The BLC Defendants' indifference to established guidance fell far below the standard of care expected of a reasonably careful bank director and dangerously magnified the Bank's risk.

57.     More specifically, the BLC Defendants approved three of the Director Loans and Ryan approved seventeen of the ILA Loans in the absence of any policy to guide the Bank's oil and gas lending. On or about August 26, 2015, the Board finally adopted a resolution expressing its intent to amend the Loan Policy to include guidance for oil and gas lending, incorporating "all

**FILED UNDER SEAL**          17

important areas contained in current regulatory guidance." The Board did not approve its first Loan Policy containing guidance for loans secured by oil and gas reserves, however, until October 21, 2015.

58.     Even after the Board adopted an oil and gas lending policy, Ryan and the other BLC Defendants recklessly ignored and violated it when extending credit and making additional loans to RM by, for example, relying on a single well and platform offshore for essentially all of the collateral value for the loans, in violation of the policy concerning concentration of collateral assets. Furthermore, as mentioned, the BLC Defendants disregarded the longstanding federal oil and gas lending guidelines for reserve-based loans. Those guidelines required loans to follow the borrowing base structure, which is the industry standard. The borrowing base structure allows lending institutions to manage oil and gas loans according to changes in commodity prices and would have saved the Bank millions of dollars of losses from this borrower relationship.

59.     The first three Director Loans to RM, approved on August 27, 2014 ($4 million, Loan 125911), February 25, 2015 ($4 million, Loan 129970), and April 22, 2015 (increasing the line of credit under Loan 129970 by $2.5 million, to $6.5 million), were to provide working capital for a new oil platform and financing to drill a new oil and gas well to replace an old well.

60.     The BLC Defendants approved these loans at a time of greatly depressed oil prices and amid well-publicized industry distress. Oil prices fell from a peak of $115 per barrel in June 2014 to under $35 per barrel at the end of February 2016. Over a hundred oil and gas companies filed for bankruptcy during this period, including one of the borrower's largest and best capitalized partners.

61.     This industry environment exacerbated numerous serious deficiencies with these Director Loans. For example, the credit memoranda lacked any meaningful financial analysis or

**FILED UNDER SEAL**          18

supporting documentation to justify the extension of credit. Indeed, in contravention of the Loan Policy applicable to all loans, the loan files were devoid of any financial statements from RM after March 2015. The limited financial information available from RM and its guarantors revealed an insolvent and over-leveraged group with minimal cash flow that plainly was not creditworthy. RM could not pay the interest, much less principal, on its loans. Yet, indifferent to the consequences to the Bank, the BLC Defendants chose to ignore these glaring problems and made multiple loans to RM to drill a single oil well amid dismal and deteriorating industry conditions.

62.     In addition, the BLC Defendants approved Loans 125911 and 129970 with little or no understanding or investigation of the loans' LTV ratios. Calculated properly, those ratios far exceeded 100%, meaning there was insufficient collateral to secure the loans. RM's oil and gas collateral did not produce enough cash flow to amortize the loans, and the collateral's value fell well short of covering the loans because of the minimal amount of producing reserves in the collateral pool. This substantial collateral shortfall, which the BLC Defendants permitted, constituted a flagrant violation of the Loan Policy. The predictable cumulative effect of the BLC Defendants' repeated disregard of the Loan Policy and of prudent lending standards was to subject First NBC to severe risk.

63.     Following these three Director Loans, Ryan approved the RM ILA Loans (totaling $51.65 million) from July 2, 2015 through August 31, 2016. Ryan used his ILA a staggering 52 times in a little over a year—averaging near-weekly $1 million advances. Ryan approved this massive expansion of credit for the purported purpose of drilling a single non-producing offshore oil well. At the time, however, the oil and gas markets were in a virtual free fall. And despite the stated purpose, the frequency of the ILA Loans and the cash-flow analyses that Ryan prepared for the borrower made it obvious that RM had insufficient cash flow to amortize the loan and that one

**FILED UNDER SEAL**          19

purpose of these credit extensions was to cover RM's interest payments to avoid non-accrual. Still, disregarding this information which clearly demonstrated RM's lack of creditworthiness and the corresponding risk that the loans posed to the Bank, Ryan kept gambling on RM by continually extending credit to this substandard borrower without requiring current financial reporting, ignoring basic principles of sound lending and violating the Bank's Loan Policy.

64.     Ryan inflated the Bank's credit exposure to RM even though the LTV greatly exceeded the Bank's policy limits and the collateral was concentrated in very limited oil and gas assets and was premised mostly on non-producing reserves, all of which repeatedly violated the Bank's lending policies, regulatory guidance, and prudent underwriting guidelines and practices.

65.     Ryan's 52 ILA Loans were especially egregious because when he began approving them, RM already owed the Bank $60 million and regulators had classified $15 million of that debt as substandard and the remaining $45 million as doubtful. Ryan grossly abused his ILA by making almost all these incremental advances after the loan's risk rating had been downgraded from "Acceptable with Care" to "Substandard" on or about July 30, 2015.

66.     In addition to the foregoing loan defects, Ryan disregarded and violated the Loan Policy's requirements for ILA Loans because he used his ILA over and over again even though no emergency justified its use, the credits for many of the ILA Loans were risk rated below 5, and he used the ILA to circumvent or bypass the lending limits set by the Board.

67.     Meanwhile, on March 23, 2016, nearly a year into Ryan's RM ILA lending spree, the BLC Defendants approved another Director Loan to RM, over the objection of the BLC Chairman, in the amount of $3.9 million (Loan 152498). The purpose of this loan was to purchase a new oil and gas lease and drill a new well in the South Bosco Field. This loan was equally irresponsible as lending institutions do not ordinarily make loans to fund both the purchase of oil

**FILED UNDER SEAL**          20

and gas leases and the subsequent drilling of a well, which is what the BLC Defendants did in approving this loan. The BLC Defendants' decision to approve this unusual loan was even more flagrant because it was risk rated "Substandard."

68.     Many of the deficiencies of the RM Loss Loans reflect and resulted from the fact that neither Ryan, who effectively acted as the loan officer on this relationship, nor other Bank staff who assisted Ryan with this borrower, had adequate, if any, oil and gas lending experience, as required by FDIC guidelines. As a result, the lending relationship was fundamentally flawed from the outset and deviated substantially from standard industry practices for reserve-based loans.

69.     The BLC Defendants irresponsibly approved the RM Loss Loans despite the obvious and grave risk that those loans posed to First NBC. Their approvals of the loans under these circumstances fell far below the standard of care of any reasonably careful bank director or officer and exhibited, at a minimum, reckless disregard of the Bank's best interests.

70.     In total, the BLC Defendants' grossly negligent approvals of the Loss Loans to RM directly and proximately caused the Bank to sustain losses of more than $64 million.

### 2.     GG Borrowing Relationship

71.     As set forth in paragraphs 51 and 52, the Loss Loans to the GG Borrowing Relationship totaled at least $73 million, and the Bank lost at least $56 million on those loans. These Loss Loans consist of at least 51 ILA Loans that Ryan approved and consolidated under 14 loan numbers (Loans 129882, 146855, 152091, 157734, 157778, 157965, 157998, 158075, 160781, 160792, 160836, 160880, 161023, and 161122); an additional five ILA Loans initially approved by Ryan but whose consolidation with other new credit amounts into Loan 157624 the BLC Defendants approved; and an additional Director Loan (Loan 161001), which the BLC Defendants also approved.

**FILED UNDER SEAL**            21

72.     As detailed below, Ryan committed gross negligence and breached his fiduciary duties in approving the GG ILA Loans by, among other things, feeding GG, whose borrowing relationship with the Bank was troubled even before these loans began, more than 50 $1 million loans, many for projects outside the Bank's territory, for vague and unspecified purported purposes, in repeated violation of the Loan Policy, when any rational banker would have known that the borrower was using loan proceeds not merely for operational purposes but to pay existing loans. The BLC Defendants committed gross negligence in approving the GG Director Loans, which included risky hotel loans, by, among other things, extending large amounts of additional credit when it was obvious that the GG Borrowers were continuing to fall short on their financial projections and needed to borrow funds just to stay afloat, the Bank's credit exposure already was overly concentrated on the GG relationship, LTV ratios were excessive, and GG was relying on continued loans from the Bank to cover debt service shortfalls.

73.     GG and his development company CPI sought these unsafe loans for multiple projects that were in the pre-development and development stage, several of which were in Arkansas and Tennessee, outside the Bank's territory.

74.     Before the BLC Defendants approved these Loss Loans, the Bank had identified the lending relationship with GG and CPI as problematic, putting GG on a CAAP, which required additional scrutiny from Ryan and the Non-Officer BLC Defendants.

75.     Nonetheless, by no later than September 2014, Ryan was regularly feeding the GG Borrowers $1 million ILA Loans. By August 2016, he had done so an astounding 54 times. For good measure, from October to November 2016, Ryan approved two half-million-dollar loans.

76.     Ryan approved the first 10 GG ILA Loans (at $1 million each) from September 2014 to February 2015. Those loans were consolidated under a new loan (Loan 129882) on or

**FILED UNDER SEAL**          22

about February 19, 2015. The next 17 ILA Loans (also at $1 million each) were issued from February 2015 to November 2015, then were consolidated under new Loan 146855 on or about November 13, 2015. From November 2015 to February 2016, Ryan approved another 13 ILA Loans (also at $1 million each), which were consolidated under Loan 152091 on or about February 17, 2016. From May to August 2016, Ryan approved another nine ILA Loans (also at $1 million each). In October and November 2016, Ryan approved another two ILA Loans (at $500,000 each).

77.     The credit memoranda for the GG ILA Loans were identical in many respects, with LTV ratios well above Loan Policy limits and a vaguely worded purported primary source of repayment: "Cash Flows from [GG Borrowers'] managed and controlled project and related companies from development activities." The stated purpose of the ILA Loans was "working capital," a similarly ambiguous term that made it easy to mask the loans' true purposes. The frequency and amount of these loans, however, made it clear that they were servicing the existing debt from the Bank. Put differently, borrower cash flows were not providing a source of repayment; rather, the ILA Loans themselves were the source of repayment.

78.     An internal Bank document, generated by a Bank officer in April 2017, admits that beginning in December 2014—before Loan 129882 was approved—the GG Borrowers lacked collateral to cover the level of debt outstanding. Nonetheless, from December 2014 to March 2017, the GG debt doubled from approximately $60 million to $120 million. During this time, overdrafts by the GG Borrowers were common yet Ryan repeatedly continued to approve loans.

79.     In approving these loans, Ryan violated Bank loan policies, including, but not limited to, those relating to limitations on credit concentration for a borrowing relationship; lack of cash flow from proven sources demonstrating an ability to repay the debt; lack of

**FILED UNDER SEAL**          23

documentation regarding the real use of loan proceeds; excessive LTV ratios; and lack of audited financial statements. Ryan's repeated violations of the Loan Policy and prudent lending standards were reckless and in derogation of his duties of care and loyalty.

80.     But Ryan was not the only one approving loans to the GG Borrowers. On or about March 23, 2016, the BLC Defendants (including Ryan) approved the loan listed in paragraph 52 in which the Bank consolidated an additional five $1 million Ryan-authorized ILA Loans together with a prior loan approved by the BLC Defendants for $6.78 million as well as new credit, for a total loan of $21 million. The stated purpose of this loan (Loan 157624) was to finance a hotel project in Hot Springs, Arkansas, outside the Bank's territory.

81.     Hotel loans are among the riskiest commercial real estate loans that banks make. It is particularly important, therefore, for banks to follow prudent lending standards and bank policies if they choose to make these loans so that they can manage and mitigate this inherent risk. In approving Loan 157624, however, the BLC Defendants recklessly ignored established bank policies, including those relating to out-of-territory lending, lack of equity, LTV ratio, and appraisal standards. The loan structure for the hotel was unorthodox and the loan was not supported by the value or operational performance of the hotel. Further, the loan violated the Loan Policy with respect to seven out of eight underwriting standards for real estate lending.

82.     The five ILA Loans that were consolidated within Loan 157624 were listed in the loan approval packet and shared the same vague description as $76 million in additional loans previously made to the GG Borrowers. From the loan packet, it was obvious to any reasonably careful bank director in the position of the BLC Defendants that the GG Borrowers were not creditworthy and were borrowing funds to stay afloat. Yet the BLC Defendants ignored the glaring risk. It likewise was obvious that GG and CPI required regular loans from the Bank to

**FILED UNDER SEAL**          24

pay their pre-existing debt to the Bank. The BLC Defendants received at least quarterly reports regarding GG and CPI, giving them even more information about GG Borrowers' credit problems. The BLC Chairman objected to the loan but the BLC Defendants voted to approve it over his objection.

83.     With respect to the remaining GG Director Loan, all BLC Defendants except Wilkinson approved another $2.81 million in credit on September 28, 2016 (Loan 161001). The purported purpose of this loan, as with the more than $50 million in Ryan-approved ILA Loans, was to provide "working capital." And, as with the Arkansas hotel loan, the BLC Chairman objected to this Director Loan, but again the BLC Defendants voted to approve it over his objection.

84.     In approving Loan 161001, the BLC Defendants ignored, among other things, the facts that the GG Borrowers lacked a valid, viable, or documented primary or secondary source of repayment; the GG Borrowers' debt service coverage ratio ("DSCR") was inadequate; the GG Borrowers had failed to show improvement in performance and cash flow, and continued to fall short of projections; the GG Borrowers' interim financial statements demonstrated their reliance on continued loans from the Bank to cover debt service shortfalls; GG's low credit score was a Bank policy exception; the LTV ratio exceeded Bank policy; and the loan exposure to the GG Borrowers violated the Loan Policy's prohibitions against over-concentration.

85.     The BLC Defendants irresponsibly approved the GG Loss Loans despite the obvious and grave risk that those loans posed to First NBC. Their approvals of the loans under these circumstances fell far below the standard of care of any reasonably careful bank director or officer and exhibited, at a minimum, reckless disregard of the Bank's best interests.

**FILED UNDER SEAL**          25

86.     In total, the BLC Defendants' grossly negligent approvals of the Loss Loans to the GG Borrowers directly and proximately caused the Bank to sustain losses of more than $56 million.

### 3.     Borrower KC

87.     As set forth in paragraph 51, the Loss Loans to Borrower KC totaled at least $2 million, and the Bank lost at least $1.9 million on those loans. These loans consisted of four ILA loans which Ryan approved from October 29, 2015 through August 31, 2016 under a single loan number (Loan 003488).

88.     As detailed below, Ryan committed gross negligence and breached his fiduciary duties in approving the KC ILA Loans by, among other things, doubling down on a borrower with an egregious history of delinquent loans and no demonstrated ability to repay based on conspicuously little information about the real estate projects that were the subject of the loans and the purported guarantee of a guarantor who had negative net worth.

89.     The loans' stated purposes were to repair, renovate, and improve various real estate properties, including residential properties and a gas station/convenience store.

90.     By the time Ryan approved the KC Loss Loans, more than $16 million of loans to the KC Borrowing Relationship had been classified as substandard. In fact, the KC Borrowing Relationship had been among those borrowing relationships most responsible for the Bank's loan classifications for years. The Bank had had to seize property held by a KC business. KC was the subject of some of the Bank's largest criticized assets. Previous KC loans were characterized by numerous renewals with little or no repayment of principal and questionable collateral protection, reflecting KC's inability or unwillingness to pay principal and interest fully. In short, it was obvious that KC was not creditworthy, but Ryan looked the other way.

**FILED UNDER SEAL**          26

91.     The loan approval packages provided little information about the real estate projects that were the purported subject of the KC Loss Loans other than vague and general statements of cost. Information was lacking, for example, as to the detail of costs and budgets, the contractors to be involved, the scope and timeframe of the projects, and the nature of the work to be performed, as required for loans of this sort. To go along with his history of serious delinquency and failure to perform on previous Bank loans, KC had low credit scores. The named guarantor's liabilities exceeded her assets. Making matters worse, these loans were unsecured.

92.     Ryan's approval of these loans violated the Loan Policy and prudent lending standards in numerous ways, including by providing overly generous, accommodative, and unduly risky loan amounts for vague loan purposes to an uncreditworthy borrower without remotely adequate financial information demonstrating an ability to repay. Ryan's credit analyses were cursory. The Bank never obtained reviewed or audited financial statements. No global cash flow analysis was performed. Ryan ignored the Bank's lending authority limits and failed to obtain required BLC approval.

93.     Ryan irresponsibly approved the KC Loss Loans despite the obvious and grave risk that those loans posed to First NBC. His approvals of the loans under these circumstances fell far below the standard of care of any reasonably careful bank director or officer and exhibited, at a minimum, reckless disregard of the Bank's best interests.

94.     In total, Ryan's grossly negligent approvals of the Loss Loans to KC directly and proximately caused the Bank to sustain losses of more than $1.9 million.

**FILED UNDER SEAL**            27

### 4.   Borrower TH

95.     As set forth in paragraphs 51 and 52, the Loss Loans to Borrower TH totaled at least $29 million, and the Bank lost at least $15 million on those loans. These Loss Loans consist of seven ILA Loans and six Director Loans.

96.     As detailed below, Ryan committed gross negligence and breached his fiduciary duties in approving the TH ILA Loans by, among other things, propping up a real estate developer with no proven source of repayment but with years of plummeting sales and growing operational losses, which wanted the money not merely to paper over its obvious financial distress but also to pay the personal expenses of its owner/guarantor. The BLC Defendants committed gross negligence in approving the TH Director Loans by, among other things, approving multiple large loans for general "working capital" purposes even as the borrower's self-serving sales speculations proved unfounded, by not requiring that a government guarantee that was necessary to make a more-than-$10-million loan defensible come through before the Bank took on the credit exposure, and by ignoring the borrowers' inability to pay such basic expenses as payroll and taxes, all for the benefit of a borrower that the Non-Officer BLC Defendants also knew was plummeting financially.

97.     In August 2016, using his administrative review authority ("ARA"), Ryan consolidated and renewed on an interest-only basis six of the seven TH ILA Loans and three of the six Director Loans into a single loan (Loan 162937). The three remaining Director Loans were made under two different loan numbers (Loans 127220 and 165126). Ryan also made an additional ILA Loan under Loan 127220.

98.     TH was the developer of a residential complex and marina on the Northshore of Lake Pontchartrain. The Loss Loans to TH concerned various aspects of this project.

**FILED UNDER SEAL**

99.     On September 24, 2014, the BLC Defendants approved a $10.15 million Director Loan to TH (Loan 127220). The purpose of this loan was to construct the first phase of a three-phase apartment complex. The credit memorandum and analysis stated that the loan was to be subject to a minimum 60% U.S. Department of Agriculture ("USDA") "conditional guarantee." The guarantee was key to mitigating the very substantial risk of this loan. That risk existed because, as the credit analysis acknowledged, repayment of the loan was dependent on TH's ability to reach its sales projections for the project. And, despite the Loan Policy's calling for primary sources of repayment to be "proven," the borrower's projections were self-serving and speculative. Furthermore, neither the guarantor, who had low credit scores and a high debt-to-income ratio, nor the guarantor's operating entity provided a secondary source of repayment. The credit analysis generously characterized TH's financial performance as reflecting "inconsistent" operations over the years reviewed, but the summary income statement showed that TH's performance was far worse than "inconsistent": sales had fallen steadily for three years while operating losses had grown. These financial declines were attributable to declines in both the national and local housing markets. Yet the BLC Defendants recklessly agreed to provide 100% financing, requiring no upfront cash equity from TH.

100.     Significantly, documents in the loan file made it clear that the USDA guarantee was not itself guaranteed. Indeed, a letter in the file stated that the Bank had not even applied for the guarantee. Yet, despite TH's highly leveraged loan request, the lack of any proven source of repayment from the borrower or guarantor, and the lack of debt service coverage by the project itself, the BLC Defendants failed to condition their approval on the guarantee actually being obtained. This flagrant violation of prudent lending standards proved catastrophic as the guarantee was not obtained, leaving the Bank exposed to millions of dollars of deficient debt.

**FILED UNDER SEAL**              29

101.    Following Loan 127220, over a span of eleven months beginning in April 2015, Ryan inflated TH's credit further through six $1 million ILA Loans (Loans 134238, 134678, 139199, 139584, 144787, and 149792, which Ryan later consolidated into Loan 162937).

102.    The first three TH ILA Loans, on April 13, June 3, and July 17, 2015, were to provide additional funds for preliminary costs associated with the borrower's condo/apartment project, nearby marina, and related roads and improvements; to pay property taxes; and to provide general working capital to support TH's ongoing operations. But the credit memoranda and credit analyses did not disclose the supposed costs on which the loan funds would be spent. The designated primary source of repayment was the future sale of units within the development, but no contracts for such sales existed, just speculative pro formas. Nor did TH offer any other source of repayment. This inadequate source of repayment contravened the Loan Policy, which, again, stated that the primary source of repayment should be one or more proven sources of cash flow. The company's sales had fallen from over $21 million in fiscal year 2011 to only $1.2 million in fiscal year 2014. Meanwhile, operating losses had grown to more than $700,000 two years running. Especially in these circumstances, TH's need for "general working capital" and funds to cover tax obligations denoted obvious financial distress.

103.    Nor was the collateral for these loans adequate. For one thing, the Loan Policy made clear that collateral was to be a backstop protection, not a primary basis for lending. Put otherwise, collateral was necessary but not sufficient to make a prudent loan and could not offset a plainly distressed borrower's lack of ability to pay. Beyond this, though, many of the appraisals purporting to support the collateral's value were stale, dating from 2012 and 2013. While the credit memoranda claimed that the appraisals had been revalidated, no information was provided to

**FILED UNDER SEAL**            30

support this claim nor was there any evidence of appraisal reviews being performed, as the Bank's Loan Policy and federal bank regulations required.

104.     And still TH's owner/guarantor was not creditworthy. Among other things, the credit analysis acknowledged that he provided no source of repayment, his credit scores were sub-prime, and he had a high debt-to-income ratio.

105.     The fourth TH ILA Loan, on September 10, 2015, did not even pretend to serve a TH purpose, much less advance the company's business prospects and consequent ability to repay the Bank. This loan's stated purpose was to cover the owner/guarantor's personal and household expenses and to reimburse him for funds he previously had advanced to TH for general working capital. In addition to the problems and deficiencies of the first three TH ILA Loans, which also applied here, the owner/guarantor's decision to have TH borrow another $1 million to pay his personal expenses was a strong indication that he was a weak guarantor and that TH did not generate cash flow sufficient to pay him what he needed to live on. And like the other TH ILA Loans, this loan was far from the kind of emergency credit the Loan Policy required for Ryan to use his ILA.

106.     The fifth TH ILA Loan, on October 18, 2015, returned to the vague purported business purpose of "general working capital." But no rational banker could have thought that TH or its owner/guarantor had improved as credit risks. To the contrary, the fact that TH kept requiring seven-figure general working capital infusions made it obvious that the company was deteriorating. While working capital lines of credit customarily support companies that experience periodic ebbs and flows to their liquidity, the kind of "permanent working capital" that First NBC continued to finance for TH amounted to simply pumping more and more money into a distressed company that could not pay it back.

**FILED UNDER SEAL**            31

107.    By the time of the final TH ILA Loan, on March 2, 2016, in addition to all the other problems set forth regarding the previous ILA Loans, LTV had jumped as a result of a significant decrease in land values. The credit analysis also reported that the marina part of TH's development was underperforming. Things had gotten so bad that TH had to record a loss before taxes of $1.6 million for the six months ending January 1, 2016.

108.    Meanwhile, on June 24, 2015, amid Ryan's ILA Loans to TH, the BLC Defendants had approved a $1.425 million Director Loan to TH (Loan 134238, later consolidated into Loan 162937). This loan's purpose was to pay $1.325 million in overdue payroll taxes and $100,000 in 2014 property taxes. Payroll taxes are one of the most routine expenses of operating a business and a very serious obligation that must be met in a timely fashion. TH's inability to pay basic tax obligations should have been a major red flag to the BLC Defendants regarding TH's financial distress.

109.    As with the TH ILA Loans, the primary source of repayment for this loan ("[s]ale of real estate/cash flow from Marina and overall operation of" TH) was based on speculative pro forma projections that had not borne fruit. TH had achieved no recent real estate sales. Nor did the loan file report plans or progress on apartment or marina rentals. This reality cast serious doubt on the 2011 feasibility study which the borrower apparently was claiming supported its sales projections. Making matters worse, the credit analyst reported that another multi-family project was being developed nearby, subjecting TH's project to competition. Here too, the owner/guarantor provided no meaningful credit support.

110.    Nevertheless, on September 3, 2015, each of the BLC Defendants except Moyse, who was absent, renewed the $10.15 million they had approved in September 2014 on Loan 127220, and, throwing good money after bad, approved a $2.4 million credit increase. As described

**FILED UNDER SEAL**          32

above, the previous approval had contemplated (but not actually required) the borrower's obtaining a loan guarantee from the USDA, which would have mitigated the risk to the Bank from the speculative real estate project for which the loan was made (the primary source of repayment being future real estate transactions supported only by unsubstantiated projections). By the time of the renewal and increase, however, the BLC Defendants knew that the borrower would not obtain the guarantee. In addition, the borrower's financial condition was getting worse. Yet the BLC Defendants approved the loan (over the BLC Chairman's dissent) without requiring the borrower to provide additional equity. As a result, collateral was inadequate and the LTV ratio was excessive, in violation of the Loan Policy.

111.    On November 18, 2015, the BLC Defendants approved two more Director Loans in the amounts of $1.5 million and $5.92 million (Loans 145040 and 145051 respectively, both of which later were consolidated into Loan 162937). Loan 145040 was to pay off another loan at Community Bank. Given TH's extremely poor financial condition, lack of performance, and unrealistic prospects for improvement, all of which the BLC Defendants knew from the loans discussed above, the BLC Defendants' approval of yet another $1.5 million in exposure to pay off another bank was another egregious departure from prudent lending standards and practices. Instead of requiring TH to reduce its debt to the Bank or at least let other banks share the risk, the BLC Defendants caused the Bank to absorb more and more of TH's obviously substantial credit risk. This is another loan that the BLC Chairman opposed.

112.    The $5.92 million loan (Loan 145051) consisted of $3 million to provide additional working capital to support TH's ongoing operation and $2.91 million to pay off two loans that TH's owner/guarantor owed the Bank personally. The owner/guarantor's desire to load more debt on top of the massive debt TH already owed to satisfy his own personal debt obligations that were

**FILED UNDER SEAL**          33

secured by his primary residence, combined with all the other information the BLC Defendants had about TH's deteriorating performance and the owner/guarantor's poor credit, put them on clear notice of TH's and its guarantor's lack of creditworthiness. Yet the BLC Defendants approved this self-evidently risky loan, also over the BLC Chairman's dissent.

113.    TH's need for $3 million in working capital on top of the millions in working capital loans that the Bank already had extended in 2015 highlighted further TH's serious financial distress. With this loan, as with the others discussed above, the stated primary source of repayment (future sales of real estate, cash flow from the marina, and the overall operation of TH) was highly speculative, made worse by the fact that TH's financial performance had been deteriorating for years. Indeed, TH's most recent summary income statement showed TH extending to four years its streak of year-over-year sales declines, with annual sales now less than $1 million, and more than doubling its annual operating loss to over $1.6 million. The represented collateral value still was based on stale two-and-a-half- to three-year-old appraisals, with only conclusory statements that the appraisals had been revalidated, unsupported by information as to who "revalidated" them, when, or on what basis. It simply is not realistic that the property values could have remained the same for years, especially given TH's lack of sales and the poor housing market to which the Bank's credit analyses referred. Yet the BLC Defendants again approved an expansion of the Bank's already considerable credit exposure to an obviously uncreditworthy borrower for conspicuously vague purposes.

114.    On July 27, 2016, Ryan approved another $1 million ILA Loan to TH. This loan was an increase to Loan 127220, the loan for Phase 1 of the apartment complex, bringing the balance of that loan to $13.55 million. By this time, the loan had been downgraded to substandard. TH's financial position was continuing to deteriorate. TH was behind on its payments to suppliers,

**FILED UNDER SEAL**                    34

did not have enough fencing and security on the project, and still had not completed the entrance to the complex despite the Bank having loaned it large amounts of money over a year-and-a-half period. This ILA Loan was another example of throwing good money after bad.

115.    But the Bank's TH lending spree did not end there. In October 2016, the BLC Defendants approved another $1.4 million loan to TH (Loan 165126). The purpose of this loan was to cover TH's payroll, accounts payable associated with its condo project, and more "general working capital." On October 26, the BLC Defendants required, as a condition to approval, a fee or rate increase and additional collateral. Five days later, though, the BLC Defendants re-approved the loan without these additional requirements. The BLC Chairman voted no both times.

116.    TH's inability to pay was apparent. A "use of proceeds" list in the loan package showed that a significant part of the loan—$420,000—was in fact to cover TH's September 2016 debt service. At close of business on October 31, those loans would have become a month past due without a payment being made to bring the loans current. As a result, the Bank would have had to report the TH loans as such on a call report that subsequently would be submitted to the FDIC. The use-of-proceeds list also suggested that the "payroll" funds might be used to cover TH account overdrafts. TH had been deemed a substandard borrower.

117.    Contrary to TH's longstanding rosy projections, the company had generated very little real estate sales activity. This failure was significant because real estate sales were supposed to be TH's primary source of repayment. Although the homebuilding company DR Horton had expressed recent interest in some of TH's land, TH's apartment/condo project was not generating cash flow. Even after having its condos listed with a real estate agent for 75 days, TH had gotten no sales contracts. Furthermore, the project now exceeded the stated time-to-complete. And the

**FILED UNDER SEAL**                35

marina portion of TH's development was generating revenues at less than 15% of projections. The collateral, consisting mostly of raw land, was inadequate, with an LTV above policy limits.

118.    Even with some land sales to DR Horton, TH's revenues for the most recent fiscal year were only $4 million, down 80% from 2011 and not enough to cover the company's general and administrative expenses and interest-only debt service. These circumstances clearly reflected an unsustainable, failing business. Meanwhile, the credit score for TH's guarantor had fallen to a paltry 593 and he still had a high debt-to-income ratio. Once again, the credit analysis stated that the guarantor provided no source of repayment. Yet the BLC Defendants turned a blind eye to the substantial risk of the Bank's making yet another loan to TH.

119.    The BLC Defendants irresponsibly approved the TH Loss Loans despite the grave and obvious risk that those loans posed to First NBC. Their approvals of the loans under these circumstances fell far below the standard of care of any reasonably careful bank director or officer and exhibited, at a minimum, reckless disregard of the Bank's best interests.

120.    In total, the BLC Defendants' grossly negligent approvals of the Loss Loans to TH directly and proximately caused the Bank to sustain losses of more than $15 million.

### 5.    Borrower AP

121.    As set forth in paragraph 51, the Loss Loans to Borrower AP totaled at least $1.5 million, and the Bank lost at least $1.48 million on those loans. These Loss Loans consist of four ILA Loans which Ryan approved under a single loan number (Loan 145469) from November 18, 2015 through March 24, 2016.

122.    As detailed below, Ryan committed gross negligence and breached his fiduciary duties in approving the AP ILA Loans by, among other things, aggressively lending on an

**FILED UNDER SEAL**          36

unsecured basis to an indisputably underperforming real estate developer that had a history of overdrafts, trouble paying taxes, speculative sources of repayment, and an overstated DSCR.

123.    The initial AP Loss Loan was an unsecured twelve-month revolving line of credit for $190,000 for the purported purpose of providing "continued work" on unspecified real estate properties. But Ryan's credit request provided no information about what "continued work" was being performed, the identity of the properties, or even the cost of the work. There was no discussion about whether the loan proceeds would add value or result in increased cash flow that could repay the loan. Nor did the loan package address why the loan was not being secured by the property being improved, which contravened prudent lending standards and practices and the Loan Policy. In other words, Ryan's purported justification for the loan lacked the most basic information that any reasonably careful banker would require.

124.    Over the next four months, Ryan approved three extensions, increasing the unsecured exposure to $1.5 million. With the first installment, Ryan increased the exposure to $500,000 for the same vague purpose listed on the original approval—"continued work"—again with no explanation. No later than the second increase to $1 million, it was evident that this was a distressed borrower. Indeed, a primary purpose of this second increase (in addition to purchasing more properties and continuing unspecified renovations) was to cover $164,000 in overdrafts, which was not new with this borrower, as was clear from the credit memorandum. The overdrafts were caused by the payment of real estate taxes and insurance, which were recurring, normal expenses known to the real estate developer. The fact that such expenses caused overdrafts that could not be cured promptly indicated serious financial difficulties. The third and final increase, bringing the total exposure from the AP ILA Loans to $1.5 million, provided still more funds for

**FILED UNDER SEAL**          37

the purchase of additional properties, along with funds for continuing renovations. Again, the loan for the purchase of property was unsecured.

125.     When Ryan approved the first $190,000 unsecured loan, the Bank already had $990,000 in unsecured credit outstanding to this borrower. Ryan compounded the situation with his subsequent increases, ballooning the Bank's unsecured exposure to $2.49 million out of the total borrowing relationship of $12.3 million.

126.     In doing so, Ryan violated the Loan Policy by failing to identify and document reliable sources of repayment, failing to adhere to underwriting, repayment, and financial information requirements, and violating policies regarding undesirable loans, overdrafts, real estate lending, and unsecured credit. For instance, Ryan approved these loans without even having a current personal financial statement of the guarantors. The guarantors, who had minimal liquidity, little income, and a sizable negative adjusted gross income ("AGI") of $1.4 million (i.e., an AGI loss), offered little support for repayment. No global cash flow analysis was performed as required and no cash flow from a proven source demonstrating an ability to repay the debt was identified. The DSCR was overstated as it included speculative sources of cash flow and unsupported assumptions, but even overstated it was less than 1:1.

127.     Ryan irresponsibly approved the AP Loss Loans despite the obvious and grave risk that those loans posed to First NBC. His approvals of the loans under these circumstances fell far below the standard of care of any reasonably careful bank director or officer and exhibited, at a minimum, reckless disregard of the Bank's best interests.

128.     In total, Ryan's grossly negligent approvals of the Loss Loans to AP directly and proximately caused the Bank to sustain losses of nearly $1.5 million.

**FILED UNDER SEAL**          38

### 6.      Borrower PCC

129.    As set forth in paragraph 51, the Loss Loans to Borrower PCC totaled at least $11 million, and the Bank lost at least $11 million on those loans. These Loss Loans consist of 12 ILA credit extensions that Ryan approved under a single loan number (Loan 019321) from August 29, 2014 through August 29, 2016.

130.    As detailed below, Ryan committed gross negligence and breached his fiduciary duties in approving the PCC ILA Loans by, among other things, nearly doubling the Bank's exposure to this construction business purportedly to fund working capital needs for new jobs despite the fact that PCC's unaudited and inadequate financial statements showed that PCC's sales were flat and, at the same time that Ryan was lavishing additional credit on PCC, its accounts with the Bank were overdrawn, often at month end, revealing that the borrower's real need for, and use of, the loans was to make loan payments because its weak cash flow was insufficient to keep the loans current.

131.    PCC operated a construction business that, according to Ryan's credit memorandum, was expanding through the addition of large contracts, including two government contracts. This new business, Ryan said, necessitated additional working capital through additional borrowing. The purported purpose of the PCC ILA Loans was to provide such working capital.

132.    These ILA Loans nearly doubled, however, the Bank's exposure to PCC to $22.5 million. And in approving these loans, Ryan repeatedly violated the Bank's lending policies, prudent lending standards, and regulatory rules, regulations, and guidance by greatly increasing the Bank's exposure without credible and adequate financial information necessary to analyze the borrower's creditworthiness.

**FILED UNDER SEAL**          39

133.    Specifically, the financial statements that PCC provided to the Bank did not show sales increasing materially. Instead, sales remained roughly flat during the period of these loans. The flat sales combined with increasing accounts receivable meant that PCC was experiencing declining receivables turnover (i.e., how often a company collects its receivables during a given period) and an increasing days receivables outstanding (i.e., the number of days it takes a company to collect cash generated by sales), indicating that PCC was waiting nearly three years to collect payments from its customers after invoicing them. Businesses are not viable under such conditions. Thus, the main supposed justification for these credit extensions—a significant increase in business—was untenable.

134.    Nor did PCC's financial information meet the minimum standards for credit underwriting and analysis. The company's financial statements not only failed to support Ryan's representations regarding its sales growth but also often were stale, incomplete, and inadequate. The financial statements were not independently prepared, reviewed, or audited, as required by the Loan Policy. Nor did the Bank obtain receivables aging data even though the Bank was relying on PCC's accounts receivables for collateral and repayment.

135.    Meanwhile, as Ryan was greatly expanding the Bank's exposure to PCC, PCC's accounts were overdrawn by sizeable amounts, revealing that its cash flow was weak. The level of overdrawn accounts at the end of the month, on multiple occasions, showed that PCC obtained and used these loan increases to keep its loans with the Bank current as it plainly did not have sufficient funds to make the required payments. Moreover, PCC's principal and guarantor had poor credit scores—with noted serious delinquencies and derogatory information—throughout the period in which Ryan approved the loans.

**FILED UNDER SEAL**          40

136.    Ryan recklessly disregarded and violated the Loan Policy's requirements for ILA Loans by using his ILA repeatedly in the absence of any emergency credit needs. Month after month, Ryan increased PCC's line of credit based upon his own generic assertions about the growth of the company, which lacked any specificity or support.

137.    Ryan irresponsibly approved the PCC Loss Loans despite the obvious and grave risk that those loans posed to First NBC. Ryan's approvals of the loans under these circumstances fell far below the standard of care of any reasonably careful bank director or officer and exhibited, at a minimum, reckless disregard of the Bank's best interests.

138.    In total, Ryan's grossly negligent approvals of the Loss Loans to PCC directly and proximately caused the Bank to sustain losses of more than $11 million.

### 7.    MP Borrowing Relationship

139.    As set forth in paragraphs 51 and 52, the Loss Loans to the MP Borrowing Relationship totaled at least $14 million, and the Bank lost at least $6 million on those loans. These Loss Loans consist of four ILA credit extensions that Ryan approved under a single loan number (Loan 122776) and one Director Loan that the BLC Defendants approved (Loan 163564).

140.    As detailed below, Ryan committed gross negligence and breached his fiduciary duties in approving the MP ILA Loans by, among other things, repeatedly using his ILA to extend credit to a substandard borrower to provide working capital for the zoning and ultimate sale of a real estate site without obtaining feasibility studies, marketing plans, or sales forecasts or projections for the site, the sale of which was supposed to pay off the loan and other debt, let alone reviewed or audited financial statements, a global cash-flow analysis, or an up-to-date and credible appraisal of the property. The BLC Defendants committed gross negligence in approving the MP Director Loan by, among other things, consolidating two tax credit loans to finance an office

**FILED UNDER SEAL**          41

building and nursing home into a "new" loan with a lower interest rate and extended maturity date despite knowing that the borrower's creditworthiness had greatly deteriorated, it had insufficient debt service coverage and collateral to support the loan under the Bank's Loan Policy, and the borrower's guarantor (and principal) already had a substandard relationship with the Bank and offered no real financial support if the project failed.

141.    Ryan approved the first $1 million MP ILA Loan on September 4, 2014. The loan established a new non-revolving line of credit to provide working capital for the operations of MP-related entities. The credit also was to be used to enhance and maintain MP's debt service on existing real estate properties owned by the borrower.

142.    The credit memorandum acknowledged, however, that MP had, on a global basis, a significant inventory of largely underperforming real estate parcels that were not generating enough cash flows to cover all debt levels. In particular, the new loan extended credit to allow MP to perform preliminary tasks for a pre-stressed concrete site, which the borrower intended to market and sell within the next 12 to 18 months. MP intended to use the money to cover various planning tasks, surveys, legal fees, and studies (like wetlands and traffic) requested by the municipality in connection with the site's total redevelopment.

143.    Ryan approved this new loan despite the fact that the borrower was classified as substandard, the borrower's real estate did not produce cash flow to carry his debt, and the loan file contained no studies, plans, or other necessary specifics of the pre-stressed concrete site, the sale of which was intended to repay the loan and his other debt to the Bank.

144.    Ryan subsequently approved three credit extensions under this loan number. On July 17, 2015, Ryan approved the first $1 million increase to pay continuing costs and interest carry for various projects while MP waited for final approval of the re-zoning, planning, and sales

**FILED UNDER SEAL**            42

of the pre-stressed concrete site, which the borrower expected to present to the municipality and receive approval for in September 2015.

145.    The approval process took longer than anticipated, however, and RM sought additional credit from the Bank. On December 18, 2015, Ryan approved a second $1 million extension of MP's line of credit. The loan proceeds were to be used for various purposes, including the payment of real estate taxes, legal fees on various settlements, other legal fees, traffic studies, and engineering reports for the planning and approvals of zoning and development of the pre-stressed concrete site.

146.    On June 30, 2016, Ryan approved a third renewal of the line of credit to consolidate two other loans issued to MP and provide $900,000 in additional funds for working capital while MP finalized the pre-stressed concrete site's re-subdivision and sales. The renewed and increased line of credit was supposed to fund ongoing legal, architectural, planning, and interest carry costs while awaiting finalization of the project, approval by the municipality, and sales of site plats and lots.

147.    The credit memoranda for each of these credit extensions, like the one for the initial loan, recognized that although MP owned a large inventory of real estate, it did not generate enough cash flow to service the borrower's debts to the Bank.

148.    Nonetheless, Ryan obliged the borrower's repeated requests for increased credit even though the borrower had a poor credit rating, was seriously delinquent, had failed to perform on previous Bank loans, and, perhaps most significantly, both he and his direct obligation loan facilities were classified as substandard.

**FILED UNDER SEAL**       43

149.     Despite these obvious and recognized red flags, Ryan renewed and increased the loan to provide MP with working capital, ultimately raising the Bank's exposure by $3.9 million, indifferent to the substantial risk to which he was exposing the Bank.

150.     Ryan's advancement of the MP Loss Loans recklessly violated the Bank's lending policies, materially departed from prudent lending standards, and contravened regulatory rules, regulations, and guidance.

151.     The Bank never obtained reviewed or audited financial statements in increasing this line of credit, nor did it perform a global cash flow analysis, as required. The Bank also did not obtain adequate collateral or a sound repayment plan for the ILA Loans even though the credit memoranda acknowledged the insufficiency of this distressed borrower's cash flow to service his debt. Instead, Ryan relied largely and repeatedly on the speculative potential for rezoning and eventual successful sale of the pre-stressed concrete site to repay the loans. Ryan did not even obtain feasibility studies, marketing plans, or sales forecasts or projections. Instead, for the December 2015 and June 2016 loans, the site was valued based on an appraisal methodology that lacked credibility.

152.     In issuing the MP ILA Loans, Ryan ignored the Bank's Loan Policy, which prohibited him from using his ILA in non-emergency situations and for distressed and substandard credit relationships, like this one, that were not risk rated 5 or better and performing as agreed.

153.     The BLC Defendants approved the MP Director Loan on January 25, 2017. The purpose of this $10.62 million loan to an MP-managed limited liability company (Loan 163564) was to consolidate and retire two prior New Market Tax Credit loans from the Bank and provide permanent financing for an office building and nursing home. MP was the loan's sole guarantor.

**FILED UNDER SEAL**          44

154.    The Director Loan suffered from many of the same deficiencies as the MP ILA Loans and similarly failed to comply with the Bank's underwriting requirements and grossly deviated from safe and sound banking practices.

155.    By the time the BLC Defendants approved this loan, MP—as well as prior Bank loans to him—had been rated substandard. MP contributed no equity and offered no real financial support as the sole guarantor if the project developed problems. Consequently, the BLC Defendants knew that the company's operating prospects represented the only theoretical source of repayment. Nevertheless, the BLC Defendants ignored the company's weak operating results and low DSCR, meaning that they approved the new loan despite knowing that the company would likely barely be able to service its debt load near maturity. The BLC Defendants also ignored that the LTV for the loan greatly exceeded the limits in the Bank's Loan Policy and thus the collateral did not adequately secure the loan.

156.    Indeed, the loan satisfied the Bank's own criteria for a Troubled Debt Restructure ("TDR") under the Loan Policy but the BLC Defendants failed to treat it as such. The loan reduced the interest and extended the maturity date for a debtor whose creditworthiness had greatly deteriorated, had insufficient debt service coverage to support the loan under the Bank's loan policy, and had a guarantor (and principal) who had a substandard relationship with the Bank. The BLC Defendants nonetheless approved the loan without following the Loan Policy's TDR procedures and special authorization requirements.

157.    The BLC Defendants irresponsibly approved the MP Loss Loans despite the obvious and grave risk that those loans posed to First NBC. Their approvals of the loans under these circumstances fell far below the standard of care of any reasonably careful bank director or officer and exhibited, at a minimum, reckless disregard of the Bank's best interests.

**FILED UNDER SEAL**                    45

158.    In total, the BLC Defendants' grossly negligent approvals of the Loss Loans to MP directly and proximately caused the Bank to sustain losses of more than $6 million.

### 8.    GSA Borrowing Relationship

159.    As set forth in paragraphs 51 and 52, the Loss Loans to the GSA Borrowing Relationship totaled at least $12.6 million, and the Bank lost at least $7.6 million on those loans. The GSA Loss Loans consist of two ILA Loans to Borrower CD (Loan 086630); five ILA Loans to Borrower SAI under two loan numbers (Loans 136856 and 143995); three ILA Loans to Borrower GD under a single loan number (Loan 148978); one Director Loan to SAI (Loan 136856); and one Director Loan to GD (Loan 148978).

160.    As detailed below, Ryan committed gross negligence and breached his fiduciary duties in approving the GSA ILA Loans by, among other things, giving a Bank insider who was a historically troubled borrower a blank check to gamble on a series of speculative real estate projects without requiring him to provide basic information about those projects and their expected costs despite overwhelming evidence that the borrower was not creditworthy. The BLC Defendants committed gross negligence in approving the GSA Director Loans by, among other things, ignoring conspicuously implausible purported sources of repayment for their insider colleague's projects, the obvious inadequacy of the proffered collateral, and numerous other Loan Policy violations, then backdating a loan to make it appear that the borrower had cleared more than $1 million in overdrafts before the previous month's end.

161.    Ryan approved the two CD ILA Loans—an initial $1 million extension followed a month later by renewal of that loan with a $1 million credit increase—on March 31 and April 29, 2015, respectively. The purpose of these loans was to finance renovations to a commercial property in the French Quarter of New Orleans.

**FILED UNDER SEAL**          46

162.     The main purported justification for the first CD ILA Loan was that CD's renter would pay incremental rent of $87,325 per year if CD made the renovations. But this stated primary source of repayment offered no prospect of repaying the loan principal. The loan was to mature 364 days after origination. By the time renovations were made and rental income achieved, the incremental rental income could be hoped at most to cover CD's incremental interest obligation, leaving little or nothing to repay the $1 million principal. The $1 million would have to be financed through a longer-term loan, but the loan file provided not a shred of information about how or when that might happen.

163.     Meanwhile, the only collateral referenced was GSA's membership interest in the CD limited liability company, an extremely illiquid asset whose value was unstated, resulting in no LTV ratio being provided. The credit memorandum acknowledged that CD was a "shell company" with no financial statements. Nor did the loan file contain any detail about what the property renovations would be, how long they would take, or how much they would cost (much less an explanation of how it just so happened that the expected costs matched the $1 million limit of Ryan's incremental lending authority). Although CD had obtained the property years before, the property generated no revenue before 2014. The credit memorandum claimed that the property should produce EBITDA in 2014, but the file contained no financial statements confirming such financial performance even though Ryan approved the loan a full three months into 2015. Indeed, the file said that 2014 operating results were not yet completed, a highly concerning failure for a small entity seeking a $1 million loan that far into the year. Nor can any serious contention be made that the CD loans were emergencies, as required for Ryan to employ his ILA powers.

164.     As reckless as the first CD ILA Loan was, the second was even worse. Without requiring any equity infusion from the borrower, Ryan funneled another $1 million to CD for more

**FILED UNDER SEAL**          47

renovations. Ryan provided no justification, however, for why the renovation costs had doubled in a month. Nor did Ryan provide any updated financial analysis showing how CD could repay an extra $1 million. To the contrary, he papered the file for what now would be a $2 million debt by essentially recycling his credit memorandum from the previous month, without changing the debt service assumptions he had used when the debt was to be only $1 million. In addition, the deficiencies outlined above with respect to the first CD loan continued to apply to the second. For example, though the second approval came almost four months into 2015, the file continued to state that 2014 operating results were not yet completed. In the end, the Bank lost nearly all the $2 million it loaned to CD.

165.     The initial Loss Loan to Borrower SAI was a $2.18 million Director Loan, which the BLC Defendants approved on July 29, 2015 (Loan 136856). Its purported purpose was to purchase a New Orleans residence for renovation and lease. The Bank already was owed more than $30 million by GSA, a problematic borrower, but bank insider, whose creditworthiness obviously was deteriorating and who already was the subject of a CAAP. Yet each of the BLC Defendants approved the loan despite, among other serious departures from the Loan Policy and sound lending practices: Ryan's credit request providing no information as to the scope, timing, cost, or financing of the pivotal renovations; multiple Loan Policy violations involving excessive LTV and Loan-to-Cost ("LTC") ratios (including as the result of a missing appraisal), meaning that the Bank had inadequate collateral to secure its loan, a problem that would become worse when further lending was needed to finance the renovations; an absence of information regarding projected rental income or any other sources of debt service coverage; violation of the Bank's Loan Policy regarding the concentration of debt with a particular borrower; and the obvious

**FILED UNDER SEAL**          48

implausibility of the purported primary source of loan repayment, namely unspecified rental income when the loan was to mature in six months and no refinancing prospects were identified.

166.    Following the Director Loan to SAI, Ryan indefensibly approved eight ILA Loans which increased GSA's borrowing by more than $7.2 million. The first of these loans, which Ryan approved on September 30, 2015, was a $1 million ILA Loan, also to SAI, as an increase to Loan 136856. Ryan then approved four more $1 million ILA Loans to SAI under a different loan number (Loan 143995), from December 7, 2015 through May 31, 2016. On January 29, 2016, April 26, 2016, and September 30, 2016, Ryan approved three ILA Loans to Borrower GD under Loan 148978.

167.    The first five of these eight extensions (one under Loan 136856 to SAI, three under Loan 143995 to SAI, and one under Loan 148978 to GD) purported to be for renovations to the property that was the subject of the initial Director Loan to SAI. Ryan recycled his credit memo from the Director Loan and substituted "improvements" for purchase of the property as the loan purpose without identifying, much less providing details of, the purported improvements being funded or otherwise addressing GSA's insatiable need for further funding for this residence. As Ryan regularly increased the size of GSA's blank check, LTV—in violation of the Loan Policy even from the initial Director Loan—got even worse. Meanwhile, GSA's credit score fell into subprime territory, with Ryan not even identifying it in his credit memos, instead saying merely that it was below 650. Eventually, a credit report in the file showed that GSA's credit score had fallen to a shocking 537 with dozens of lengthy delinquencies. Yet Ryan still provided no projections of rental income or costs to operate the property once renovated. No audited or reviewed financial statements were obtained. No global cash flow analysis for GSA was performed.

**FILED UNDER SEAL**          49

168.    One of Ryan's ILA Loans relating to the residence, which he approved on January 29, 2016, was a $715,000 increase in Loan 148978 to GD based on the purported justification that another GSA-controlled property was under contract to be sold and the proceeds would be used to pay back the loan quickly. When the property was sold, however, GSA did not use the proceeds to pay the loan, that collateral now was gone, and Ryan continued to approve more risky GSA Loss Loan credit extensions from which harm to the Bank was highly probable.

169.    While GSA continued to demand, and Ryan continued to approve, more money for the residence project, Ryan gave GSA another blank check for another speculative project. On April 26, 2016, Ryan approved a $1 million ILA increase to Loan 148978, the stated purpose of which was for GD to buy and renovate an old church to lease to the New Orleans Opera.

170.    The borrower had negative equity in the church project because GSA used a significant amount of the proceeds to pay bank overdrafts and make other loan payments rather than for the renovation itself, and a significant part of the purported collateral did not exist because it had been sold without the sale proceeds being used to repay loans as promised. Furthermore, no details were provided as to a lease with the Opera, nor was information provided as to the necessary renovations.

171.    Despite the foregoing and other deficiencies, on February 2, 2017, the BLC Defendants approved a $3,511,000 renewal to Loan 148978, which included a $1,296,000 increase with an "effective date" of January 31, 2017. The purpose of this loan was to increase a loan that already exceeded $2 million to cover the borrower's account overdrafts and pay closing costs associated with the church renovation project. Ryan's approval of or acquiescence in approximately $1.2 million of GSA overdrafts was yet another example of his gross negligence and breach of fiduciary duty, as it was, in effect, another credit extension to a borrower who, for

**FILED UNDER SEAL**          50

the reasons above, was obviously uncreditworthy—an extension made without complying with the Loan Policy's provisions for loans of this magnitude. By formalizing the seven-figure overdrafts of a plainly distressed borrower into a one-year interest-only loan, the BLC Defendants then increased the Bank's risk by depriving the Bank of the more immediate remedies available to it with respect to overdrafts. On information and belief, the loan was backdated to justify retroactively the clearing on the books by January's month-end of the $1.2 million in GSA account overdrafts.

172.    In sum, Ryan and the other BLC Defendants permitted GSA, their insider colleague, to gamble on multiple risky and speculative real estate projects despite overwhelming facts that would have caused any prudent banker to say enough is enough.

173.    The BLC Defendants irresponsibly approved the GSA Loss Loans despite the obvious and grave risk that those loans posed to First NBC. Their approvals of the loans under these circumstances fell far below the standard of care of any reasonably careful bank director or officer and exhibited, at a minimum, reckless disregard of the Bank's best interests.

174.    In total, the BLC Defendants' grossly negligent approvals of the Loss Loans to the GSA Borrowing Relationship directly and proximately caused the Bank to sustain losses of more than $7.6 million.

**D.    Timeliness**

175.    All the claims in this complaint are timely made. The FDIC became Receiver for First NBC on April 28, 2017. Pursuant to 12 U.S.C. § 1821(d)(14), the limitation period for the FDIC-R's claims under 12 U.S.C. § 1821(k) runs three years from that date. Any prescription and peremption periods that otherwise would apply to state-law claims that had not expired as of April 28, 2017 are extended to no less than three years from that date.

**FILED UNDER SEAL**          51

176.    The Bank did not sustain injury on any Loss Loan before April 28, 2016.

177.    No Loss Loan was approved before April 28, 2014.

178.    Consequently, no prescriptive or peremptive period under Louisiana law could have expired by April 28, 2017.

**E.      The Bank's D&O Insurance Coverage**

179.    As described below, each of the Insurer Defendants issued one or more insurance policies to the Bank's parent company, FNBC. These policies include the Bank and its directors and officers, including the BLC Defendants, as insureds.

180.    Zurich issued a primary insurance policy with Policy Number DPO 9311202-04 and policy limits of $15,000,000 for the policy period June 9, 2015 to December 31, 2016 (the "2016 Primary Policy"). This policy includes $1 million in excess coverage in certain circumstances.

181.    INIC issued a first-layer excess insurance policy with Policy Number 01-415-73-85 and policy limits of $15,000,000 for the policy period June 9, 2015 to December 31, 2016.

182.    Continental issued a second-layer excess insurance policy with Policy Number 596594782 and policy limits of $10,000,000 for the policy period June 9, 2015 to December 31, 2016.

183.    Great American issued a third-layer excess insurance policy with Policy Number DFX1491031 and policy limits of 10,000,000 for the policy period June 9, 2015 to December 31, 2016.

184.    Federal Insurance issued a fourth-layer excess insurance policy with a Policy Number of 8243-6165 and policy limits of $10,000,000 for the policy period June 9, 2015 to December 31, 2016.

**FILED UNDER SEAL**          52

185.    The INIC, Continental, Great American, and Federal Insurance excess policies described in paragraphs 181-184 are collectively referred to as the "2016 Excess Policies."  The 2016 Primary Policy and 2016 Excess Policies are collectively referred to as the "2016 Policies."

186.    U.S. Specialty issued a primary insurance policy with Policy Number 14-MGU-16-A39690 and policy limits of $10,000,000 for the policy period December 31, 2016 to December 31, 2017 (the "2017 Primary Policy").

187.    XL issued a first-layer excess insurance policy with Policy Number ELU148261-16 and policy limits of $10,000,000 for the policy period December 31, 2016 to December 31, 2017.

188.    INIC issued a second-layer excess insurance policy with Policy Number 06-473-18-11 and policy limits of $10,000,000 for the policy period December 31, 2016 to December 31, 2017.

189.    Freedom issued a third-layer excess insurance policy with Policy Number XMF1602583 and policy limits of $10,000,000 for the policy period December 31, 2016 to December 31, 2017.

190.    Markel issued a fourth-layer excess insurance policy with Policy Number MKLM6EL0002907 and policy limits of $5,000,000 for the policy period December 31, 2016 to December 31, 2017.

191.    Berkshire Hathaway issued a fifth-layer excess insurance policy with Policy Number 47-EPF-303265-01 and policy limits of $5,000,000 for the policy period December 31, 2016 to December 31, 2017.

192.    INIC issued a sixth-layer excess insurance policy with Policy Number 06-481-51-29 and policy limits of $5,000,000 for the policy period December 31, 2016 to December 31, 2017.

**FILED UNDER SEAL**          53

193.    U.S. Specialty issued a seventh-layer excess insurance policy with Policy Number 14-MGU-16-A39694 and policy limits of $5,000,000 for the policy period December 31, 2016 to December 31, 2017.

194.    The XL, INIC, Freedom, Markel, Berkshire Hathaway, and U.S. Specialty policies described in paragraphs 187-193 are collectively referred to as the "2017 Excess Policies." The 2017 Primary Policy and 2017 Excess Policies are collectively referred to as the "2017 Policies."

195.    The 2016 Policies and 2017 Policies form two "towers" of insurance as shown in the following graph:



196.    The 2016 and 2017 Policies provide insurance coverage for the FDIC-R's losses on the Loss Loans by stating, among other things, that the Insurer Defendants will pay on behalf of the BLC Defendants losses on account of claims for wrongful acts committed by the BLC Defendants.

**FILED UNDER SEAL**          54

197.    As detailed throughout this complaint and summarized below, the FDIC-R's claims seek recovery for losses the Bank incurred as a result of the BLC Defendants' wrongful acts.

## CLAIMS FOR RELIEF

### COUNT I

### Gross Negligence by Ryan with Respect to the ILA Loans

198.    The FDIC-R repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 197 of this complaint.

199.    Title 12 U.S.C. § 1821(k), enacted as part of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), makes officers and directors of FDIC-insured financial institutions personally liable to the FDIC-R for their gross negligence as that term is defined and determined by applicable state law.

200.    As defined and determined by Louisiana law, gross negligence means a reckless disregard of, or a carelessness amounting to indifference to the best interests of, the Bank and involves a substantial deviation below the standard of care expected to be maintained by a reasonably careful person under like circumstances.

201.    With respect to the ILA Loans, Ryan's particular violations of, and departures from, sound lending practices differed among the borrowers as set forth for Borrower RM in paragraphs 54-70 above, the GG Borrowing Relationship in paragraphs 71-86 above, Borrower KC in paragraphs 87-94 above, Borrower TH in paragraphs 95-120 above, Borrower AP in paragraphs 121-128 above, Borrower PCC in paragraphs 129-138 above, the MP Borrowing Relationship in paragraphs 139-158 above, and the GSA Borrowing Relationship in paragraphs 159-174 above. Nonetheless, with respect to each borrower or borrowing relationship, by approving and otherwise committing the acts and omissions detailed above, Ryan disregarded and violated the Loan Policy,

**FILED UNDER SEAL**          55

banking regulations, underwriting guidelines, and prudent and sound lending practices, thereby acted with reckless disregard of, and/or a carelessness amounting to indifference to, the best interests of the Bank, and deviated substantially below the standard of care expected to be maintained by a reasonably careful person under like circumstances.

202.    Consequently, Ryan committed gross negligence as that term is defined and determined by Louisiana law.

203.    As a direct and proximate result of Ryan's gross negligence with respect to the ILA Loans, the Bank suffered damage and sustained losses exceeding $113 million or such other amount as may be proved at trial.

<u>**COUNT II**</u>

**Gross Negligence by the BLC Defendants with Respect to the Director Loans**

204.    The FDIC-R repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 203 of this complaint.

205.    With respect to the Director Loans, the BLC Defendants' particular violations of, and departures from, sound lending practices differed among the borrowers as set forth for Borrower RM in paragraphs 54-70 above, the GG Borrowing Relationship in paragraphs 71-86 above, Borrower TH in paragraphs 95-120 above, the MP Borrowing Relationship in paragraphs 139-158 above, and the GSA Borrowing Relationship in paragraphs 159-174 above. Nonetheless, with respect to each borrower or borrowing relationship, by approving and otherwise committing the acts and omissions detailed above, Ryan and the Non-Officer BLC Defendants disregarded and violated the Loan Policy, banking regulations, underwriting guidelines, and prudent and sound lending practices, thereby acted with reckless disregard of, and/or a carelessness amounting to

**FILED UNDER SEAL**

indifference to, the best interests of the Bank, and deviated substantially below the standard of care expected to be maintained by a reasonably careful person under like circumstances.

206.    Consequently, the BLC Defendants committed gross negligence as that term is defined and determined by Louisiana law.

207.    As a direct and proximate result of the BLC Defendants' gross negligence with respect to the Director Loans, the Bank suffered damage and sustained losses exceeding $51 million or such other amount as may be proved at trial.

**COUNT III**

**Breach of Fiduciary Duty by Ryan**

208.    The FDIC-R repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 207 of this complaint.

209.    Title 12 U.S.C. § 1821(k) also makes officers and directors of FDIC-insured financial institutions personally liable for monetary damages to the FDIC-R for conduct that demonstrates a greater disregard of a duty of care than gross negligence, as those terms are defined and determined under state law.

210.    Under Louisiana law, the officers and directors of Louisiana banks stand in a fiduciary relation to their bank.

211.    As Board Chairman and President and CEO of the Bank, Ryan served in a fiduciary capacity and owed the Bank fiduciary duties to exercise loyalty and good faith in the management, supervision, and conduct of the Bank's business and financial affairs.

212.    In his capacity as President and CEO, Ryan dealt directly with the borrowers identified in paragraphs 54-174 above and either authored or approved many of the deficient credit memoranda. In substance, Ryan was the Bank's relationship manager who oversaw the

**FILED UNDER SEAL**              57

relationship with the borrowers. Yet Ryan chose to turn a blind eye to the obvious and egregious deficiencies in the Loss Loans that existed with respect to the different borrowers.

213.    At the same time, Ryan had a substantial personal financial interest in the form of large annual performance-based cash incentives and equity incentives through FNBC stock and stock options that were tied to the reported financial performance of FNBC and thus depended on his driving the Bank's performance metrics. Ryan even pledged his shares in FNBC as security for loans that financed his personal business ventures.

214.    Though Ryan's particular violations and departures from sound lending practices with respect to the ILA Loans differed among the borrowers (as set forth for Borrower RM in paragraphs 54-70 above, the GG Borrowing Relationship in paragraphs 71-86 above, Borrower KC in paragraphs 87-94 above, Borrower TH in paragraphs 95-120 above, Borrower AP in paragraphs 121-128 above, Borrower PCC in paragraphs 129-138 above, the MP Borrowing Relationship in paragraphs 139-158 above, and the GSA Borrowing Relationship in paragraphs 159-174 above), in each case, Ryan made a choice to advance his perceived personal interests at the expense of the Bank.

215.    As such, when he approved and otherwise committed the acts and omissions detailed above with respect to the ILA Loans, Ryan consciously disregarded the Bank's best interests and his duties to the Bank, acted in bad faith to benefit himself rather than advance the best interests of the Bank, and accordingly breached his fiduciary duty of good faith and intentionally violated his fiduciary duty of loyalty to the Bank.

216.    As a direct and proximate cause of Ryan's breaches of fiduciary duty with respect to the ILA Loans, the Bank suffered damage and sustained losses exceeding $113 million, or such other amount as may be proved at trial.

**FILED UNDER SEAL**          58

## COUNT IV

### (Direct Action Claim Against the Insurer Defendants)

217.    The FDIC-R repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 216 of this complaint.

218.    As alleged in paragraphs 17-26 and 179-197, the Insurer Defendants issued liability insurance policies that cover losses arising from the wrongful acts at issue by the BLC Defendants.

219.    All conditions precedent for such coverage to apply have been satisfied.

220.    Under the 2016 Policies and 2017 Policies, the Insurer Defendants must pay all loss that the BLC Defendants are legally obligated to pay to the FDIC-R due to the BLC Defendants' wrongful acts.

221.    Accordingly, pursuant to Louisiana Revised Statutes § 22:1269, the Insurer Defendants are solidarily liable with their insureds to the FDIC-R, under their respective policies and to the limits of those policies, for the damages the BLC Defendants caused to the Bank as described in this complaint.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the FDIC-R requests a trial by jury on all claims pleaded in this complaint.


WHEREFORE, the FDIC-R prays that that its complaint be deemed good and sufficient and that, after due proceedings are had hereon, judgment be entered in its favor against the BLC Defendants jointly, severally, and in solido for damages, pre- and post-judgment interest, costs of suit, and such other general, legal, equitable, and further relief as this Court deems just and proper in the circumstances.

**FILED UNDER SEAL**        59

Respectfully submitted,

 /s/ James M. Garner
JAMES M. GARNER (# 19589)
JOSHUA S. FORCE (# 21975)
BRANDON W. KEAY (# 36528)
**SHER GARNER CAHILL RICHTER
        KLEIN & HILBERT, L.L.C.**
909 Poydras Street, 28th Floor
New Orleans, Louisiana 70112-1033
Telephone:     (504) 299-2100
Facsimile:      (504) 299-2300
E-Mail:         jgarner@shergarner.com
                jforce@shergarner.com
                bkeay@shergarner.com

-and-

ANDREW R. SHOEMAKER
PAUL H. SCHWARTZ
(*pro hac vice* applications forthcoming)
**SHOEMAKER GHISELLI + SCHWARTZ LLC**
1811 Pearl Street
Boulder, Colorado 80302
Telephone:     (303) 530-3452
Facsimile:      (303) 530-4071
E-Mail:         ashoemaker@sgslitigation.com
                pschwartz@sgslitigation.com

*Attorneys for Plaintiff Federal Deposit Insurance Corporation, as Receiver for First NBC Bank*

**FILED UNDER SEAL**      60